Cassini v. Riley, Biomonte, Fusito, and County of Lauderdale are on submission. Good morning, everybody. Thank you for hearing me, Your Honor. I think probably you should have a little bit of background on this first. It's up to you. You have seven minutes. Okay, I'll give it to you. I have been working since 14 years old and was the launch model for CoverGirl Makeup over 250 magazine covers. I made all my own money. I was married to my only husband, Oleg, November 11, 1971, many decades ago in London. We met in Paris, France, where I was... I don't think we need that background. The background, I think, might not be the case. Let's focus on what your claims are here. What my claims are here is that I did all the licensing work for the trademark that brought in all the income. My sister and I, with our company called Jameau Limited, she did all the PR and everything else, making number one in Harrods, London, in fragrance, number one in Neiman Marcus for evening wear, and a whole bunch of different things. We have not been paid. I have had nothing but disparagement and abuse from the Nassau County Court. My sister did all the public relations, and she made big, big contracts, and so did I. We started with putting back the celebrity tenants, and they put in millions of dollars of advertising, which was good for the brand. Oleg was a talent junior champion of tennis. We did a big business in home furnishings, which bought the place that we occupied in Oyster Bay Cove. I have been... I was named... In fact, there's papers here, I can give it to you, where he wrote in his own handwriting, you know, my wife, Marianne, and so forth. I have received absolutely zero. The illegally appointed receiver by Judge Riley sold everything, keeping the money. I was incarcerated for no reason for eight months of my life based on a severed motion, a severed order of another law firm that Judge Riley severed. She never would allow anything to happen. It was incredibly difficult. I don't think anybody's experienced the terrible things that I have. We did a tremendous amount of work for Oleg, including a special car that was designed for American Motors. It was named the best car by the trade publications. I negotiated a contract for him with... 25 years ago for a bridal, which became number one worldwide. And Oleg died unexpectedly in 2006 from a broken blood vessel in his head. He said that he had taken two Tylenol and maybe they were too strong. I'm told that in 1996 I purchased a fragrance company, Cassini Parfums Limited, and pursuant to an option agreement exercise, I was the president from its inception. And here's even a picture in a trade publication. President. I looked a lot better in those days. Not so much stress. And here we are negotiating contracts just to show you that... I just want to make sure you have a chance, if you want to, to address their legal points, which is whatever experiences you had with the corner point receiver and Judge Riley... First of all, the receiver... Let me finish the question. Sorry, Your Honor. The receiver was... Let me finish the question. Sorry. The question doesn't... There's a law that says they're entitled to immunity, that you can't sue under the federal statute. I understand. The Rooker-Feldman, which is not a... No, the Rooker-Feldman's a different thing. Rooker-Feldman is that it's been decided in state court, and therefore we shouldn't decide it here. I'm asking you a different question, which is the law is that those officials in their judicial capacity or quasi-judicial capacity can't be sued, and that's the situation where you're trying to sue them under a statute where we have said you can't sue them. And I may be frustrating to you, but that's what the law is. I understand, Your Honor, that nobody is above the law, but when somebody does such terrible things that were done by Judge Riley and also by Rosalia Biavanti stealing money out of my bank account, I think they should be punished. I don't think that's correct. I couldn't do that to somebody, and I don't think even if they are officers of the court or if it's a judge, they shouldn't be allowed to do that. The abuse that I have received, eight months of incarceration on a severed motion, is beyond the pale. I have suffered so much because of this Judge Riley. She should be removed from being in the law business. That's my opinion. I think everybody's entitled to one. I think that's an amendment of the Constitution also. She never followed due process. That's the Sixth Amendment. She breached almost every amendment that is in the Constitution, the 13th, the 6th, the 4th, breaking into places, stealing stuff. I mean, this is – nobody would really believe it. That's why I wanted to give you some background to show you that I'm a credible person. I've been working my whole life, and I made a lot of money for my husband, and we were very happy together. But this has become an absolute nightmare. Reading the papers that were put in here by the attorney, she states – and I think she's correct about the case in Nassau County was not finished when the federal case started. So, therefore, that would knock out the Rooker-Feldman from what I'm reading. I think this is such a case that is so terrible that it really deserves attention. Nobody suffered the stuff that I had gone through. I'm legally married for 40 years, and I'm treated like dirt. That's just impossible to happen in this country. And it happened to me, and I didn't even get an apology. They think they did the right thing. Anyway, that's everything that they did was thrown out by the – here's the Appellate Division, Second Department. They threw everything out. Here's the IRS, Mrs. Cassini, everything that's in the thing belongs to you, and your papers are accepted as files. The IRS, I think, is a bigger – is a much more important thing than – here's two ones from Julie Webster, Senior Paralegal, Trusts and Estates for the Internal Revenue Service. I think that's a more powerful personality and force than the Nassau County Surrogate Court of Judge Riley. Here's the Appellate Division, Second Department. Everything was thrown out. I shouldn't maybe be doing this. It's just that it's important, I think, that you're a very important person. So is everybody here. I think it's important that this is handled. This shouldn't happen to anybody else. I'm the legal wife, and I'm treated like dirt. All of these things, my stuff, furniture, this, jewelry, everything was stolen or sold by Judge Riley and Rosalia Beaumonti. I don't think that should happen to anybody, but it happened to me, and nobody hardly would even believe it. Thrown out. That's the Fourth Amendment, the Sixth Amendment. The – what is – how many amendments are there? The Thirteenth Amendment. Every amendment that there is pretty much was broken, and I think it should be addressed by the court. I really do. All right. Thank you. Thank you, Ms. Cassini. Did I talk too much? No, you ran out of time. I ran out of time? Oh, I'm sorry. No, no. I said you were right on time. Your time is up, but you have your three minutes for rebuttal. So they're going to talk, and then you have three minutes. Okay, that's fine. All right. Do you want any of these papers? You probably have them already, right? Thank you. All right. Ms. Greenwald. Good morning, and may it please the Court. Blair Greenwald on behalf of the appellee, Judge Riley. This Court should affirm the district court's dismissal here for several reasons. First and most simply, the appellant's opening brief did not argue that there was any particular error in anything that the district court did in its decision, and has therefore waived any challenge to that dismissal order. The Court may affirm this appeal on that basis alone and need not go any further. So the argument was abandoned? Yes, Your Honor. But she is per se, and you all made arguments on the merits anyway. Would there be any prejudice by reaching a decision? I do think that some of the specific arguments in her reply were not, including some specific case law, we were unable to address. I think that is not particularly fair. I will also note that while she does cite the manifest injustice exception, this Court very rarely applies that exception. And, in fact, the case that she cites shows that the Court does not apply that exception, even in the case of pro se parties. Go ahead. I also had a question about the reliance on a First Circuit case for Rooker-Feldman. Is that analysis consistent with our precedent? So I believe it is in the context of the orders that are challenged here, and I can walk through each of those just to allay any concerns, which are consistent with this Court's, in particular, most recent decision in Hunter v. McMahon. So if you look at the three orders we're talking about, there's authorizing the sale of the Oyster Bay property on Long Island, authorizing the auction and sale of personal property, and the contempt order and accompanying arrest warrant. So as to the first two, the sale of the real property and the personal property, in the surrogate's court, and this is explained in more detail in our brief, but in the surrogate's court, the way these actions work is that essentially these types of applications are treated as separate special proceedings that end in a final order or decree. And so the order's authorizing the sales of those property items. Yeah, I'm worried we're a little further afield than the question I asked. I'm just trying to figure out why the district court cited the First Circuit for Rooker-Feldman and what is the relevant or comparable Second Circuit law for the same proposition, or it was your new one that we need to create new law in order to not be reliant on the First Circuit? So we are not asking this Court to create new law. I think the primary reason the district court cited the First Circuit case was, one, it was cited in this Court's decision in Hoblock, and two, the Hunter decision, I think, came out while briefing was ongoing on the motion to dismiss, but the district court, I think, did cite that case as well. And the district court's decision was consistent because Hunter also acknowledges that when an order is final for purposes of state court review and, therefore, is ready to the extent it can be appealed to the U.S. Supreme Court, then it falls within the Rooker-Feldman doctrine. May I? Are you? I just didn't want to cut in prematurely. Let's assume, hypothetically, that we were not persuaded that Ms. Cassini abandoned the challenges to the Rooker-Feldman or the excessive force analysis, the waiver issue or abandonment are off the table. And let's also assume that if we were to find that the district court did not correctly find that Rooker-Feldman doctrine divested it of subject matter jurisdiction. Is there another basis on which you claim we should affirm the district court? Yes. So just before I get to that question, I'd just like to quickly note that the district court, separate from Rooker-Feldman, found that the excessive force claim was time-barred. The appellant, even in her reply, does not challenge that, so I think that one is done with. But as for the remaining claims, so speaking for Judge Riley, in particular, the judicial immunity doctrine bars any of the claims against her. They're all, you know, about actions that were taken in her role as a judge and fall squarely within the judicial immunity doctrine. I will note other appellees have other alternative arguments that I'm sure they will bring up. But for those reasons, we would urge the court to affirm the dismissal. Because I'm not sure that it's appropriate for this court to consider whether we should adopt the First Circuit issue by issue on Rooker-Feldman on a case where we don't have full briefing on that. Would you agree with that? So I understand. I think the analysis we present in our brief is perfectly consistent with Hunter v. McMahon, but I also understand that this court will often say, you know, assuming Rooker-Feldman doesn't apply, here's why we affirm anyway. And we think that would be an appropriate resolution, at least as for appellee Judge Riley. All right. Thank you. Thank you. All right. Mr. Miller. Good morning, Your Honor. It's Jeffrey Miller from Westman Ball, and I represent the court-appointed receiver, myself, and our brief was also submitted on behalf of Ken Mann, who's the lawyer for the public administrator and William Doyle's galleries. We also submit that the appellant waived her arguments. The arguments obviously weren't set forth in any way in the moving brief, but I'll rely on argument from counsel. There are also several other independent legal reasons why this appeal should be denied, and Rooker-Feldman is one of them, and I would submit that the body of case law. Can you explain to me why us deciding this on Rooker-Feldman ground would not have to recognize a new frontier? There's a really finely tuned approach that we would need to be able to draft here, or at least tell me why I'm wrong. Tell me why we would not have to recognize a new frontier, or if we did, why we should. Your Honor, I don't think that the court is breaking new ground in any way. Actually, I think the court, if it didn't hold up the appeal based on Rooker-Feldman, would be changing existing law, and the reason why I say that is the whole policy behind Rooker-Feldman is that there are issues that are finally decided in another court, here the state court, and then a litigant who's bound by those findings comes to a different court, here the southern district, and alleges that there is conduct that she was wronged and that she needs to be addressed, but that conduct, if addressed, and if she wins, would make findings that are directly at odds with factual findings in the state court proceeding that were finally decided. There were three issues that were addressed in the state court proceeding. One of them was dealing with, and I should say, and I think this is important to understand, the assets that are at issue in this case all belong to the Ole Cassini, Inc., which it is. But in terms of Rooker-Feldman, if the complaint, which we have to accept the allegations as true, alleges ongoing wrongdoing, an ongoing scheme, ongoing looting, how does that square with our decision in Hunter v. McMahon that the state court, that for the Rooker-Feldman to apply, the district court proceedings had to have ended? And I understand your argument is going to be they ended, but she's claiming and alleging, which we have to accept, that the wrong is ongoing and that this is ongoing. So how unless we adopt the First Circuit analysis also issued that issue. So I'm trying to why do we need to go there, counsel? I'm going to address that directly, Justice Kagan, because I think there's an assumption in your question that respectively is inaccurate. You're assuming that there's an inconsistency between finality in the state court and the First Circuit decision. That's not the case. The factual issues that are the subject of this case that Appellant alleges are ongoing were finally decided against there. There is literally no way under the law, and that's not an exaggeration, there is literally no way to make a finding on any of the claims in the Appellant's case and to rule in her favor without making factual findings, which are directly contrary to findings that she is bound by because of the state court proceedings. All of the claims that she's making in this case deal with a house in McCoon's Lane owned by this company, OCI, that was sold. That was sold pursuant to court orders, just like in any other receivership, where there's a full and fair opportunity to behold, to be heard. The Appellant had the fullest and fairest opportunity to be heard and was heard extensively on this issue. But the court still decided that that issue should be sold and her concerns were— Would you at least concede that that is new ground for us, this sort of interlocutory orders idea? I mean, where is the case that you think that we have? I feel like we've got district courts that have certainly applied, Rooker-Feldman, in these kinds of circumstances like the ones that you're having. We've also had district courts recognize that we haven't yet adopted the First Circuit's reading, and we have Hunter saying, let's be careful about not being too expansive. So I'm going to go back to—I either need— I mean, it seems to me there are a limited number of answers. There's the, yes, you're going to need to adopt new law here, and we think it should be the First Circuit. No, you don't need to adopt new law because X case applies in this situation, in which case you'd be the first person telling us, because the district courts aren't saying we have Second Circuit law that does that. The district court below didn't say there was Second Circuit law that does that. So you can tell me which of those two options you think we are. You are making a case for why our rule should be a certain way. Go ahead. I'm saying two things to you, Your Honor. I'm saying that the proceedings in this State court did end. We don't have to get into the issue from the First Circuit. They did end. As a matter of law, they ended. There's no argument or position that's different. And the factual findings that are underpinning here, if you don't adopt that argument and that position and this case moves forward, the only way to resolve this case is to make findings that are inconsistent with factual findings that are already decided in another court, and that can't be heard again. Counsel, unless there's an alternative basis for us to decide this case short of getting to the merits on a motion to dismiss stage, I'm suggesting not 12b-1, but 12b-6. That's what the question is directed at. Yeah. Your counsel, you understand that, right? Yeah. I'm sorry. I thought I understood it. It's 12b-1. But I would also say, alternatively, there were several other grounds. There's judicial immunity as the receiver. There's the Barton cases. There's none of these claims lie and can be dismissed under 12b-6 all independently because they're all based on factual findings that cannot be changed in this case. So I hope I addressed those arguments here. If not, if there are no more questions, I'll rely on our submissions. All right. Thank you. All right. Mr. Cassini, you have three minutes. I've got your papers. Okay. First of all, the property in Oyster Bay Cove was owned by Oli Cassini, Inc. We bought it together the first day of spring 1978. The IRS ruled that both companies belong to me, and there's a very long ruling on that. That was done in 2017. Mr. Miller has received it several times, and so has all the people out there, but nobody ever responded to it. I think that this is something that should happen. Mr. Miller is incorrect. There's still things ongoing out there. This case is not completed. This case is still ongoing. Property belonging to me, solely belonging to me, furniture, art, antiques, and $200,000 worth of jewelry was stolen from my property in Oyster Bay Cove, Mr. Miller. We put in papers, but Judge Riley ignored everything. She ignored every single thing. I think she should really be removed, and I think she was removed September 8th from the bench. How can somebody do something like this? It's really hard to believe. The IRS is a much more important institution than Judge Riley in Nassau County. They ruled. They looked at all the papers. They said she called me. Julie Webster called me personally, and she said, Your papers are accepted as files because there were no companies in the will because they had already been decided before. The Perkin Company I bought in 1996. The other one was held as joint tenants with rights of survivorship, just the same as a house that we had here in Gramercy Park. That's the way Oleg wanted to do it. That's the way it was done. Did you appeal all those rulings that you think were incorrect by Judge Riley? Yes. Everything was overturned by the Appellate Division, Second Department, on February 13th, 2020, by three judges. In fact, Judge Alan Shenkman, he was the presiding judge at the oral argument. He said Judge Riley breached her own stay. She made a severed motion January 7th, 2016, when she first came in. We were never allowed to argue about that there shouldn't be any receiver because everything was already done. She went ahead and appointed Rosalia Villamonte as a receiver on July 1st of 2016. All of that was thrown out, vacated by the Appellate Division, because he also said, Judge Shenkman, she had a stay in place. It's on the oral argument. I can give you the link if you'd like to look at it. I think Mr. Miller is making a lot of mistakes here. In fact, he threatened me. He said if I interfered at all with the sale of Oyster Bay Cove or the sale of my company, Oleg Cassini, Inc., to David's Bridal, a company that I introduced and I made the license agreements with, that he was going to hurt me. He threatened me in the courtroom walking down the hallway. I'm afraid of him. In fact, I'm afraid to go out there. I'm afraid to be killed. And that's a fact. Mr. Mahon, who is the attorney for the public administrator, two times asked for bribes. February 13th, in the courtroom, he asked for a million dollars for his firm to be carved out of the litigation and another time for $100,000, July 15th. I feel that I have been wrong, greatly wrong. I'm the wife for almost, what, 40 years, since 1971? And I got zero. All my property and stuff was sold, jewelry, furniture, everything. And I have bills of sale to prove it. We made an order to show cause. Frank Cettio did it. June 23rd, I think it was, or 21st, showing bills of sale, paid bills, checks and everything else on the furniture they sold through Doyle Galleries. She didn't even look at it, Judge Riley. I understand. I'm sorry to get so passionate, but it's been hell. I understand. I've been to hell and back. It's like the Audie Murphy movie. It's all fine. It's fine. Thank you for coming in today. We appreciate it. Well, I think your court should hear this. I think it's really, really important. We are hearing it. That's why we're here. No, I'm so sorry to get so emotional, but it's been very horrible. I mean, I've been married for decades. I made all the money for the business. And all of a sudden, I got not one red cent. Everything that belonged to me was sold at cheap prices. A property valued at 43 and a half acres, valued at $30 million, she sells for $9 million. We understand. I'm so sorry. We take all the cases seriously, so I can assure you. I hope you hear this. I think it's important for the country. All right. Thank you. I have all the backup papers if you want to see them. We're good. Do you want me to present them to you? No, we have the record. We're good. Okay. Thank you. Thank you. Have a good day.